IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RENECHA MARIE GULLEY,<br><br>                              Petitioner,<br><br>        vs.<br><br>TINA HORNBECK, Warden,<br>Valley State Prison for Women,<br><br>                              Respondent. | Case No. 2:09-cv-03451-JKS<br><br><br>MEMORANDUM DECISION |

        Petitioner, Renecha Marie Gulley, a state prisoner proceeding *pro se*, has filed a Petition

for Writ of Habeas Corpus under 28 U.S.C. § 2254.  Gulley is currently in the custody of the

California Department of Corrections, incarcerated at the Valley State Prison for Women in

Chowchilla, California.  Respondent has filed an answer.  Gulley has not filed a traverse.

STATEMENT OF THE FACTS[1]

Prosecution Evidence Before Both Juries
        On July 18, 2004, at 8:45 a.m., the Sacramento Metropolitan Fire Department was
dispatched to a call for a child who had fallen out of bed. A fire engine and ambulance
arrived at the scene together at 8:51 a.m. Thomas Dunne, a paramedic firefighter, arrived
in the ambulance. Dunne testified that as he was pulling the ambulance gurney out a man
carrying a small child walked up and set the child on the gurney. The child
(three-year-old Christopher Thomas) FN3. was limp and not responding at all. Dunne
was not expecting this as usually a fall with a head injury is a bump on the head.

――――――――――――――

        [1] The following facts are taken verbatim from the opinion of the California Court of
Appeal, Third Appellate District. (Lodged Doc. No. 4).  Under the Antiterrorism and Effective
Death Penalty Act , the determination of these facts is presumed to be correct, and Gulley has the
burden of rebutting that presumption by "clear and convincing evidence."  28 U.S.C. §
2254(e)(1).

FN3. Due to the similarity in names between the victim Christopher Thomas and defendant Earl Christopher, we will refer to the child victim simply as Christopher. We will refer to defendant as defendant Christopher.

Christopher was breathing, but his jaws were clenched tight. Dunne rubbed Christopher to wake him up, but Christopher did not move. When Dunne pinched Christopher's hand hard, one arm moved a little bit. When Dunne lifted the T-shirt Christopher was wearing, he saw bruises everywhere, including on Christopher's chest, hip, buttocks, and back. He also noticed burn marks on Christopher's lower extremities. Although Christopher's pupils were initially the same size, on the ride to the hospital, one of Christopher's eyes became "blown," which means the pupil became really big, eventually becoming fully dilated. Christopher's eyes deviated to the left. Christopher's symptoms indicated a bleed in the brain causing pressure on the brain.

The ambulance traveled "code three" to the hospital and arrived at 9:17 a.m. Christopher was whisked into the emergency room. He was unconscious and nonresponsive. Dunne described him as lifeless.

Dr. Kevin Coulter, a pediatrician with a specialty in child abuse and the medical director of the child abuse clinic at the University of California Davis Medical Center was called to help with the medical assessment of Christopher. Coulter first saw Christopher in the intensive care unit after Christopher's examination in the emergency room and after completion of the initial medical tests. The CAT scan of Christopher's head revealed a subdural hematoma, a bleeding over the surface of the brain between the brain and the skull. The bleeding in Christopher's head covered the left side of his brain and was also underneath the brain, causing pressure on his brain.  The brain had become swollen and the combination of swelling and blood had shifted Christopher's brain to the right. There was no evidence of a skull fracture or injuries to the spinal cord. Coulter originally thought there was not only fresh subdural blood on Christopher's brain, but also old blood. He later revised that opinion to conclude all of the blood was from a recent acute hemorrhage.

Christopher's condition was grave on his arrival at the hospital. In order to control the swelling of Christopher's brain, Christopher was taken into surgery even though he was not in a stable condition. Neurosurgeons removed a bone flap from Christopher's skull in order to try to suction blood off the brain and allow space for his brain to swell out of the opening. Christopher became very unstable during surgery, suffering a 15- to 45-minute period of time in the operating room when he needed cardiopulmonary resuscitation. Christopher's brain was not in a condition where Christopher could be saved. The brain death protocol was started with a first exam at 10:00 p.m. on July 18, 2004. The exam showed Christopher's brain had died. When a second exam confirmed the result, Christopher was declared legally dead on July 19, 2004.

Coulter testified Christopher had a number of bruises and other injuries on his body. There were parallel lines of bruising on the front of his chest, a bruise below his knee, areas of injury to his left forearm, an area of healing injury to his wrist, a healing abrasion on his right upper thigh, an injury to his upper cheek right below the left eye, older burn scars on his lower leg, and bruises on his right thigh, right hip, over his right buttocks, on his right shin, on his back and on the front and back of his right upper arm. Although the bruises below the knee were consistent with accidental injury, the bruises in the other areas were more likely inflicted injuries. Some of the bruising was consistent with grasping injuries; others were consistent with an object impacting Christopher's body. Coulter testified the injuries were not the result of medical intervention. In Coulter's opinion, all of the bruising except the scars was inflicted within the previous nine days. None of the injuries from the neck down were life-threatening.

Coulter opined Christopher's brain injury was the result of an acceleration/deceleration action similar to what happens in a car accident or a fall from a

balcony. It could have been the result of an impact too, but with an acceleration/deceleration component. A fall from a bed was unlikely to have caused either the fatal head injury or the totality of the bruising. Coulter testified an adult pushing Christopher into a wall with one hand could explain Christopher's injuries depending on the force of the push and impact.

Coulter testified one single event caused the bleeding on Christopher's brain. However, he explained multiple actions can occur within an event and that "event" really meant episode that "may encompass a multiplicity of actions [.]" Coulter believed Christopher sustained his head injury within 24 hours from his hospital admission, but could not rule out that Christopher was injured twice within such time. Christopher's head injuries could have happened between 4:00 a.m. and 9:00 a.m.

Coulter was shown a video, taken approximately eight hours before Christopher was brought to the hospital, of Christopher interacting with a puppy. Coulter testified it was unlikely Christopher's head injury had occurred at that point. Coulter was also shown a video of a fist fight between Christopher and his five-year-old brother Deon. Coulter testified neither the fight nor any similar interactions caused Christopher's injuries.

Dr. Stephany Fiore, a forensic pathologist, performed an autopsy of Christopher. Fiore noted bruising on Christopher's fingers in addition to the bruises and scars noted by Coulter. The bruise on Christopher's thigh was deep, extending into the fat below the skin. Others were more superficial. All of the bruises and scrapes were fresh injuries that happened around the same time. She estimated the time of the injuries in the realm of hours rather than days prior to death.

Fiore noted three areas of trauma on the outside of Christopher's head: a bruise on his left cheek; a bruise on the left side of his forehead; and another bruise on the left side of the back of his head. Inside his head, Christopher had large subdural hemorrhaging that preexisted the medical intervention. All of the blood was new. The bruises showed Christopher received blows that could have caused the subdural bleeding. One or all three of the blows could have caused the bleed.

Fiore gave the cause of death as blunt force injuries to the head. She testified great force was required to produce these injuries and that it was not medically reasonable to conclude they were caused by a simple fall from a bed. According to Fiore, a child of the age, size and physical capabilities of Deon would not have been capable of inflicting the injuries that caused Christopher's death. The fatal injuries were consistent with being shaken back and forth or being slammed into a wall.

With these types of injuries, Fiore expected a progression of symptoms. Immediate loss of consciousness could occur, from which the injured person might or might not recover. This would be followed by a phase of symptoms caused by the accumulation of blood within the skull and the swelling of the brain. Such symptoms would include a change in the level of consciousness, changes in the eyes, and sometimes vomiting. A loss of consciousness would usually occur within a very short period of time.

Fiore agreed with Coulter that Christopher did not appear to have been injured at the time the video with the puppy was taken. She believed the injury probably occurred within a few hours of the time 911 was called. She testified there was a medical possibility that prompt medical attention may have kept Christopher alive, but given his significant head injury she could not say in what condition he would have lived.

<u>Statements Given At The Scene</u>

At the scene, defendant Christopher identified himself as Christopher's godfather to a deputy sheriff, who arrived with the fire department and ambulance that morning. He told the deputy Christopher frequently stayed at defendants' apartment. He had been staying with them for the previous nine days. Defendant Christopher claimed Christopher usually had a new bruise every time he came to visit.

Defendant Christopher told the deputy that he left the apartment around 6:00 a.m. to take his wife, defendant Gulley, to work. Three children were left at the apartment; his nephew Jeffrey Bailey and his godchildren Christopher and Deon. When defendant Christopher returned, he moved Christopher from the front room into the bedroom

because their puppy was messing with Christopher when he was in the front room. Around 8:00 a.m. defendant Christopher heard a thud in the bedroom. When he went to check on Christopher, he saw him on the floor, lying next to a speaker box. Christopher's eyes were open, but he looked dazed. Defendant Christopher brought Christopher out to the front room and put him on the couch. His head kind of flopped back and he appeared to go to sleep.

Defendant Christopher became concerned when he later could not wake Christopher. He called his wife at work and told her she needed to come home. Defendant Christopher subsequently took Christopher with him to pick up his wife from work and they went together to the VA hospital on Mather Air Force Base. It turned out there was no emergency facility there. Defendant Christopher declined an employee's offer to call 911 for them. Defendants went home and called 911.

Another sheriff's deputy entered the defendants' apartment just after Christopher was picked up by the ambulance. He observed Jeffrey asleep on a loveseat and Deon asleep on the floor. When he awoke, Deon told the deputy he had been staying with defendants, his godparents, for a number of days. Deon made a spontaneous statement: "Please don't put him in jail." When asked, Deon said he was referring to his godfather. Deon related that his godfather woke him early that morning and asked where Christopher got his whoopings. Deon said he did not know and went back to sleep. Deon told the deputy that his godfather had punched Christopher very hard in the chest and demonstrated the punch for the deputy by punching himself with a closed fist. Deon said his godfather hit Christopher in the same manner during the previous night and Christopher cried really hard. Deon said he got whoopings from both his godparents and his mother. Christopher got more whoopings because he was really bad.

### Defendant Gulley's Interview Statements

Defendants agreed to accompany officers downtown to talk about the circumstances leading to Christopher's hospitalization. Defendant Gulley and defendant Christopher were placed in adjoining rooms where they could communicate through the common wall. A videotape of defendant Gulley's interview with Sheriff's Detective Tom Koontz was played at trial. FN4

FN4. Although defendant Gulley requests this court view the videotape of this interview, the videotape was never transmitted to this court. (See Cal. Rules of Court, rules 8.224 & 8.320(e).) We have relied on the transcript of the interviews contained in the clerk's transcript on appeal and the testimony regarding such interviews.

For the first several hours of the six-hour interview defendant Gulley claimed Christopher was fine when she left for work that morning around 5:30 or 5:45 a.m. Defendant Christopher took her to work and would have been back home around five to 10 minutes later. She said defendant Christopher started calling her at work around 7:30 or 7:45 a.m. saying something was wrong with Christopher and that he was not responding. Defendant Gulley told her husband that Christopher was probably just tired and to let him sleep. Defendant Christopher continued to phone defendant Gulley. Assured that Christopher was breathing fine, did not have a temperature, and was not cold or pale, defendant Gulley continued to recommend letting Christopher sleep. Defendant Gulley told defendant Christopher not to call 911 because she thought he was exaggerating. She became more concerned when defendant Christopher told her he had lifted Christopher's eyelids and that one of the pupils was bigger than the other and that Christopher had fallen off the bed and hit the speaker box. Defendant Gulley called Kaiser to speak with an advice nurse, but was told they could not give out advice to nonmembers.

Defendant Gulley's manager would not let her leave because she was the only employee at work. Defendant Christopher brought Christopher to the AM/PM to convince the manager defendant Gulley was not lying and needed to leave. Defendants took Christopher to the hospital by the Air Force Base, but it did not have an emergency

room. They took him home and called 911. The only thing defendant Gulley knew happened to Christopher was that he fell off the bed and hit the speaker box. Defendant Gulley said she was willing to take a lie detector test as she was telling the truth.

When Koontz left the interview room defendants spoke to each other through the adjoining wall. After their conversation, defendant Gulley changed her story. She told Koontz that when she woke up for work she saw Christopher laying there without his clothes on. Defendant Gulley told Christopher to go stand in the corner until she left. Christopher started crying. Defendant Gulley grabbed him by his arm, but he would not stand on his feet. He kept falling to his knees. Defendant Gulley grabbed him, shook him and pushed him towards the corner, telling him to stand in the corner. Defendant Gulley claimed she only shook Christopher with one hand. To her it wasn't hard, but to Christopher it probably was. She said that when she pushed him against the wall, he hit his head. When she was ready to leave for work, she put clothes on Christopher and laid him down to go to sleep. She claimed defendant Christopher did not know that she had shaken Christopher. It did not cross her mind to tell defendant Christopher about the incident when he started calling her at work. She did not have him call 911 even after he said one of Christopher's pupils was bigger than the other because she did not think he knew what he was talking about and she wanted to see Christopher for herself. She denied it was because she did not want to get in trouble for shaking Christopher.

When Koontz left the interview room again, defendant Gulley told defendant Christopher through the wall: "Baby? I told them I did it.... 'Cause I didn't want you to have to go through all that you're going through over there.... It's either me or you, babe.... Huh? 'Cause I heard her over there antagonizing you.... Everybody is trying to put that shit on you. I didn't sell. I didn't sell.... They need somebody and it's either going to [be] you or it's going to be me. Promise to stay by my side. Okay?" When Koontz returned and asked defendant Gulley if she was trying to protect somebody, she said she was telling the truth and she was not just saying she did it. FN5. In a later conversation with defendant Christopher through the wall, she told him they would have to let him go now.

FN5. She refused to take an offered lie detector test at this point, but later said they could give her the test as to whether she only disciplined Christopher by spanking him.

The next day Koontz interviewed defendant Gulley again. The tape of that interview was also played for the jury. Defendant Gulley told Koontz that Christopher was awake when she got up for work and that he had taken his clothes off. Defendant Gulley told him to get up and put some clothes on. Christopher just sat there, so defendant Gulley told him to go stand in the corner. Defendant Gulley brushed by Christopher as he was standing in the corner. She bumped him and he fell. She picked him up by his arm to get him to his feet, but he kept falling to his knees. She instructed him to stand up and get in the corner. She "kind of projected him" towards the corner and he fell and hit his head. After about five minutes, she told Christopher to go lay down and he walked over and laid down. She went to work. She told defendant Christopher not to call 911 even after several of his phone calls to her at work because she wanted to wait and see if Christopher would wake up. FN6.

FN6. She offered to take a lie detector test during the course of the July 19 interview.

<u>Jeffrey's and Deon's Trial Testimony</u>

At trial, Deon testified Christopher got in trouble the night before his death. He thought Christopher was spanked or put in a corner. Christopher got punished by defendants a lot of times. Defendant Gulley spanked Christopher with a big belt, an electric cord, and a spoon. Defendant Christopher spanked him with a belt and a big lace. Both defendants hit Christopher with their hands. Deon thought defendant Christopher threw Christopher and that was how Christopher got killed. Deon heard the army video

game defendant Christopher was playing pause and then heard a bam or a boom on the wall, like something hit the wall. Christopher cried. Defendant Gulley was not there at that time in the morning.

Defendant Christopher's nephew Jeffrey testified at trial. He was 10 years old at the time of Christopher's death. Jeffrey testified Christopher got in trouble on the morning of his death when he peed on himself. Defendant Gulley told Christopher to go to the bathroom and he had to stand in the corner for awhile. Defendants then left so defendant Gulley could go to work. Christopher kept crying for some juice after defendants left. Jeffrey testified Deon, bothered by Christopher's crying, kicked/pushed Christopher. Christopher fell and hit his head on the coffee table. Christopher cried and held and rubbed his head. Christopher was dizzy. He laid down on the couch. According to Jeffrey, Christopher had bruises from what Deon did. Deon did not like Christopher and always hit him with toys and stuff when defendants were not looking. Jeffrey admitted he went to visit defendant Christopher in jail a lot of times, but denied his family talked to him about what to say to help his uncle.

Sacramento Sheriff's Detective Kelly Clark testified he spoke with Jeffrey on July 18, 2004 around 10:45 a.m. Jeffrey never told Clark that Deon kicked Christopher causing him to hit his head. Jeffrey not only said he never saw Deon hit Christopher, but he said he never saw anyone hit Christopher.

Jeffrey's mother testified she took Jeffrey to see defendant Christopher in jail a number of times, but denied defendant Christopher suggested Jeffrey should testify that defendant Christopher did nothing to Christopher or that she suggested to Jeffrey what he should say in court.

<u>Prosecution Evidence Before Defendant Gulley's Jury Only</u>

One of the sheriff's deputies who responded to assist with the injured child call spoke with defendant Gulley at the apartment. Defendant Gulley said she was the godmother of Christopher and Deon. Defendant Gulley told the deputy it was not uncommon for her to keep Christopher and Deon for weeks or months at a time. She thought their mother was not a very good mother and that she abused the children. Christopher would frequently come over with bruises. She allowed the deputy to enter the apartment to check on the two children remaining there.

Defendant Gulley wanted to show the deputy where Christopher fell. She took him to the bedroom where she moved a speaker from at least three feet away from the bed closer to the bed and said that was where it had been when Christopher fell.

Defendant Gulley told the deputy that the previous night Christopher ate a good dinner, had fun, and stayed up to 10:00 or 10:30 p.m. Christopher got up around 3:00 a.m. and asked for a drink of water. Defendant Gulley told him no and to go back to bed. Nothing was wrong with Christopher at that time. Christopher was still asleep when defendant Gulley got up for work around 5:45 or 6:00 a.m. At that time the other boys were still playing videogames. Defendant Christopher drove her to work at the AM/PM around 6:00 a.m. She received the first of several phone calls from defendant Christopher telling her Christopher fell out of bed and was not responding around 7:45 a.m. He called her five to seven times, but she could not leave work as she was the only employee there. Defendant Christopher brought Christopher to the AM/PM and defendant Gulley took him in to show her manager. After her manager turned her back on them, defendant Gulley carried Christopher back to the car and they left. Defendant Gulley described Christopher at that time as lifeless.

Defendants went to the Mather hospital, but were told they could not be helped. Since they did not know what was wrong with Christopher, they took him home and called 911.

Robert Piispanen, a coworker of defendant Gulley, testified he was woken up by a phone call from defendant Gulley at 7:15 a.m., at the latest 7:25 a.m., on July 18, 2004. Defendant Gulley told him she was not able to work that day as her godson was sick. She was going to take the child to the hospital. Piispanen asked why her husband could not take the child, but agreed to come into work to cover defendant Gulley's shift. Piispanen

got to the AM/PM around 8:15 or 8:30 a.m. Defendant Gulley and her husband left with the child.

<u>Defense Evidence Before Both Juries</u>

Defendant Gulley testified on her own behalf. She denied striking Christopher the morning he was taken to the hospital. She said she did not slam him against the wall and she did not cause any bruising. She denied doing anything to cause Christopher's death. She admitted she told defendant Christopher not to call 911 even after his third phone call to her. She said she thought Christopher's responses sounded normal and his injuries were not that severe.

Defendant Gulley decided to take the blame for Christopher's injuries after talking to defendant Christopher while they were in custody. Defendant Christopher told her he would take the blame. Defendant Gulley felt hurt because she did not believe he caused the injuries and she did not want him to take the blame. She decided to take the blame instead. Her statement to Koontz after that conversation was not truthful. She felt pressured by the officer. She thought if she told the officer something to satisfy him, she would be arrested and defendant Christopher would be set free. Even though both of them were subsequently arrested, she stuck to her story the next day because she believed her innocence would be shown. Something would show Christopher's fatal injury was from falling off the bed and hitting his head.

<u>Defense Evidence Before Defendant Gulley's Jury Only</u>

Dr. Richard Ofshe, a professor of social psychology and expert on police interrogations and the manner in which a person can be manipulated into giving a false confession, testified before defendant Gulley's jury. He testified regarding police interrogation techniques and correlated some of those techniques to Koontz's interview of defendant Gulley. Ofshe had listened to the communication between defendants while they were being interrogated and believed her subsequent confession was consistent with defendant Gulley's testimony that she confessed to match defendant Christopher's offer to do it for her. Ofshe felt defendant Gulley's confession was contaminated in the sense that Koontz shaped the confession by suggesting what it should contain.

PROCEDURAL HISTORY

Defendants Gulley and Christopher were found guilty by separate juries of assault by a caretaker on a child under the age of eight with force likely to produce great bodily injury resulting in death and second degree murder.  Both Gulley and Defendant Christopher were sentenced to a prison term of twenty five years to life for their convictions of assault causing the death of a child.  The trial court also sentenced each of them to 15 years on their second degree murder convictions, but these sentences were stayed.

Defendant Gulley timely appealed her conviction and sentence to the California Court of Appeal, Third Appellate District.  The court modified the judgment to award Gulley 828 days of pre-sentence credit and then affirmed the judgment, as modified, in a reasoned, unpublished

decision.[2]  Gulley filed a petition for review in the California Supreme Court, but her petition was denied on December 17, 2008.

On December 14, 2009, Gulley timely filed her petition in this Court.  In her petition, Gulley raises two grounds for relief: that the trial court erred by giving an instruction on concurrent causation, namely CALJIC 3.41; and, that her trial counsel was ineffective. Respondent contends that Gulley's second ground is unexhausted.

<u>STANDARD OF REVIEW</u>

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court renders its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[3]  The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."[4]  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.[5]  Thus, where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"[6]  When a claim falls under the

---

[2]  Lodged Doc. 4.

[3] 28 U.S.C. § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 404-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

[4] *Williams*, 529 U.S. at 412.

[5] *Early v. Packer*, 537 U.S. 3, 10 (2002).

[6] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations by the Court); *see Wright v. Van Patten*, 552 U.S. 120, 127 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the

"unreasonable application" prong, a state court's application of Supreme Court precedent must be objectively unreasonable, not just incorrect or erroneous.[7]  The Supreme Court has made clear that the objectively unreasonable standard is a substantially higher threshold than simply believing that the state court determination was incorrect.[8]  "[A]bsent a specific constitutional violation, federal habeas corpus review of trial error is limited to whether the error 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"[9]  In a federal habeas proceeding, the standard under which this Court must assess the prejudicial impact of constitutional error in a state-court criminal trial is whether the error had a substantial and injurious effect or influence in determining the outcome.[10]  Because state court judgments of conviction and sentence carry a presumption of finality and legality, the petitioner has the burden of showing by a preponderance of the evidence that he or she merits habeas relief.[11]

In applying this standard, this Court reviews the last reasoned decision by the state court.[12]  State appellate court decisions that affirm a lower court's opinion without explanation

---

case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

[7] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[8] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

[9] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

[10] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

[11] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

[12] *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004).

are presumed to have adopted the reasoning of the lower court.[13]  Under AEDPA, the state

court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption

by clear and convincing evidence.[14]  This presumption applies to state trial courts and appellate

courts alike.[15]  "[A]lthough we independently review the record, we still defer to the state court's

ultimate decision."[16]

<u>DISCUSSION</u>

As noted above, Gulley raises two grounds for relief in her petition.  This Court will

address each ground in order.

<u>The Court Erred by Giving CALJIC 3.41</u>

After the prosecution and defense rested, the trial court instructed the jury with both

CALCRIM 620 (Causation) and CALJIC 3.41 (Concurrent Causation).[17]  Gulley argues that it

---

[13] *Ylst*, 501 U.S. at 802-03.

[14] 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

[15] *Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004).

[16] *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).  This Court notes, however, that the question of the deference to be given summary denials was left open by the Ninth Circuit sitting en banc.  *See Pinholster v. Ayers*, 590 F.3d 651, 663 (9th Cir. 2009) (en banc); *Richter v. Hickman*, 578 F.3d 944, 951 n.5 (9th Cir. 2009) (en banc).  The issue is presently pending before the Supreme Court *sub nom, Harrington v. Richter*, No. 09-587.

[17]    CALCRIM No. 620 reads as follows:
        There may be more than one cause of death.  An act causes death only if it is a substantial factor in causing the death.  A substantial factor is more than a trivial or remote factor.  However, it does not need to be the only factor that causes the death.  To constitute the crime of murder or assault causing the death of a child there must be, in addition to the death an unlawful act or omission which was a cause of that death.  Criminal law has its own particular way of defining cause.  A cause of the death is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission, the death and without which the death would not occur.  If you have a reasonable doubt whether the defendant's act caused the death, you must find him or her not guilty.

CALJIC No. 3.41 reads as follows:
        When the conduct of two or more persons contributes concurrently as a cause of

10

was error to instruct the jury with CALJIC 3.41 (Concurrent Causation) because, when combined with the instruction on Causation, it allowed "the jury to find that the target crimes were a cause of death and that both defendants[,] having participated in those crimes[,] were guilty of murder, thus[,] short circuiting the findings required for direct aiding and abetting or a natural and probable consequences theory of liability."[18]  Gulley argues that "no matter whose account of the infliction of that injury [the fatal injury] the jury believed[,] there was only defendant present and acting to cause it all, since all witnesses testified that the death was cause by one acute injury."[19]  Finally, Gulley argues, without any substantive explanation, that the court "exacerbated" its error by adding a paragraph to CALCRIM 403 (Natural and Probable Consequences).[20]

On direct review, the California Court of Appeal rejected Gulley's claim, reasoning, in relevant part:

> On appeal, defendants contend the trial court erred in instructing their juries with CALJIC No. 3.41 FN7 on concurrent causation because there was no evidence to support a finding defendants were acting together at the time the fatal injury was inflicted on Christopher. FN8 Pointing to the jury instruction given on causation in general, FN9

---

the death, the conduct of each is a cause of the death if that conduct was also a substantial factor contributing to the death.  A cause is concurrent if it was operative at the moment of death and acted with another cause to produce the death.  If you find that the defendant's conduct was a cause of death to another person, then it is no defense that the conduct of some other person contributed to the death.

[18]  Petition, p. 16.

[19]  Petition, p. 16.  The prosecution presented evidence that Gulley was trying to take full responsibility for the killing and exonerate Defendant Christopher.  To the extent that she argues that she, alone, was present and caused the death of Christopher, the reading of CALJIC 3.41 did not prejudice her, since she is admitting actual guilt.

[20]  The court instructed the Jury as follows:
> The People are alleging that the defendant originally intended to aid or abet child abuse likely to produce great bodily injury or inflicting physical punishment to the child. If you decide that he/she aided and abetted one of those crimes and that murder or assault causing death of a child was the natural and probable result of one of those crimes, then the defendant is guilty of murder and/or assault causing death of the child.  You do not need to agree which of the crimes the defendant aided and abetted.

defendants contend the combination of CALJIC No. 3.41 and the causation instruction permitted "the jury to find that the target crimes were a cause of death and that both defendants, having participated in the child abuse alleged as the target crimes were guilty of murder, thus short circuiting the findings required for aiding and abetting child homicide [assault causing death of a child- § 273ab charge] or the elements required to find [the defendant] guilty of a murder/homicide committed by [their codefendant] under the natural and probable consequences theory of liability." FN10  Put another way, defendants argue the instructions allowed each of their juries to decide each defendant was guilty of murder and assault causing death of a child simply based on their equal liability for the non-life-threatening abuse of Christopher over the course of the nine days prior to his fatal injury. The error was exacerbated, according to defendants, when the trial court added a paragraph to the natural and probable consequences instruction that told the jury if it found defendant aided and abetted one of the uncharged target offenses "and that murder and/or assault causing the death of a child was the natural and probable result of one of those crimes, then the defendant is guilty of murder and/or assault causing the death of a child. You do not need to agree which of the crimes the defendant aided and abetted." We reject defendants' claims.

FN7. Both juries were instructed from CALJIC No. 3.41 as follows: "When the conduct of two or more persons contributes concurrently as a cause of the death, the conduct of each is a cause of the death if that conduct was also a substantial factor contributing to the death. A cause is concurrent if it was operative at the moment of death and acted with another cause to produce the death.  If you find that the defendant's conduct was a cause of death to another person, then it is no defense that the conduct of some other person contributed to the death."

FN8. Although neither defendant objected to the instruction in the trial court, we may review the claim on appeal "if the substantial rights of the defendant were affected thereby." (§ 1259.)

FN9. Both juries were instructed on causation in language combined from CALJIC No. 3.40 and Judicial Council of California Criminal Jury Instructions (2006-2007), CALCRIM No. 620 as follows: "There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death. To constitute the crime of murder or assault causing the death of a child there must be, in addition to the death an unlawful act or omission which was a cause of that death. Criminal law has its own particular way of defining cause. A cause of the death is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission, the death and without which the death would not occur.  If you have a reasonable doubt whether the defendant's act caused the death, you must find him or her not guilty."

FN10. Both juries were instructed that defendant could be guilty of the charged offenses (assault causing the death of a child and murder) based on being the actual perpetrator of the crime or based on aiding and abetting someone else who committed the crime. (CALCRIM No. 400.) With respect to aiding and abetting, the juries were instructed on principles applicable to aiding and abetting the crime (CALCRIM No. 401) and the natural and probable consequences theory of liability for aiding and abetting the uncharged target crimes of child abuse likely to produce great bodily harm or death (§ 273a, subd. (a)) or inflicting physical punishment. (§ 273d, subd.(a).) (CALCRIM Nos. 403, 821, 822.)

First, there was sufficient evidence introduced to support the trial court's giving of the concurrent causation instruction (CALJIC No. 3.41) because evidence was

admitted showing Christopher's head injury could have been the result of multiple acts. Specifically, although Coulter testified there was evidence of one injury to Christopher's head, presumably from one event, he immediately said he could not rule out the possibility that there were additional events along with it and he explained that multiple actions can occur within an event. By "event," Coulter said he really meant episode that "may encompass a multiplicity of actions[.]" Coulter believed Christopher sustained his head injury within 24 hours from his hospital admission, but could not rule out that Christopher was injured twice within such time. Fiore noted three areas of trauma on the outside of Christopher's head; a bruise on his left cheek, a bruise on the left side of his forehead, and another bruise on the left side of the back of his head. The bruises showed Christopher received blows that could have caused the subdural bleeding. One or all three of the blows could have caused the bleed. According to Fiore, the fatal injuries were consistent with being shaken back and forth or being slammed into a wall.

Thus, contrary to defendants' argument, there was evidence from which the jury could have found, as the prosecutor expressly argued, Christopher was fatally injured by the acts of both defendants (i.e., both being shaken and pushed into the wall by defendant Gulley and then later being thrown into a wall by defendant Christopher) with each defendant's action being a concurrent cause of Christopher's death.

Defendants argue against this conclusion, claiming Coulter's testimony is "unclear at best" and that it is inconsistent with his earlier testimony that he saw one injury leading him to presume Christopher was injured in one event. Defendant Gulley also contends Coulter's description of the type of actions necessary to cause Christopher's injury was not consistent with what defendant Gulley said she did to Christopher and that the medical testimony was much more supportive of Deon's testimony that defendant Christopher threw Christopher into a wall after defendant Gulley went to work.

To the contrary, Coulter's testimony is clear that multiple actions could be part of "one event" as he was using the term. It is also clear that his testimony referring to one fatal injury referred to the subdural hematoma Christopher suffered, as opposed to the myriad of other bruises, abrasions, and burns he observed on Christopher's body, and not to the act or acts causing such fatal injury. Coulter's description of the type of actions that could cause an injury like Christopher's was consistent with the type of acceleration/deceleration with impact actions defendant Gulley admitted she performed. The jury did not have to credit defendant Gulley's description and possible minimization of the amount of force she used in shaking and pushing Christopher. Coulter testified an adult pushing Christopher into a wall with one hand could  explain Christopher's injuries depending on the force of the push and impact. Fiore specifically testified Christopher's fatal injuries were consistent with being shaken back and forth or being slammed into a wall. Thus, the medical testimony supported several possibilities; that Christopher was fatally injured by defendant Gulley's actions, by defendant Christopher's actions, or by both of their actions.

Defendant Gulley, however, contends concurrent causation of Christopher's head injury is inconsistent with Fiore's testimony that Christopher would have lost consciousness immediately or almost immediately after the fatal act. In fact, Fiore testified immediate unconsciousness could occur after this type of injury, from which the injured person might or might not recover. A phase of symptoms would then follow that would include a change in the level of consciousness. Fiore testified there is "usually" a loss of consciousness within a very short period of time. This testimony does not preclude a determination by the jury that defendant Gulley shook/pushed Christopher a couple of minutes before she left for work between 5:45 a.m. and 6:00 a.m., that Christopher was conscious when she left for work, and that when defendant Christopher returned five to 10 minutes later, defendant Christopher threw Christopher against a wall.

We also note a second way in which the juries could have found concurrent causation of Christopher's death. The juries could have believed defendant Gulley's trial testimony that her confessions during the interviews with Koontz were false, and

defendant Gulley did not shake/push Christopher. The juries could have believed that Christopher received his fatal head injury when defendant Christopher threw him into a wall, but that Christopher would not have died if defendant Gulley had insisted on defendant Christopher immediately getting him medical attention instead of directing defendant Christopher not to call 911. Christopher had been left in defendant Gulley's care for the previous nine days, during which time Christopher received all of the injuries resulting in the bruises and abrasions noted by the doctors. Knowing this situation, defendant Gulley was under a duty to promptly seek medical attention for Christopher when her husband called, starting before 7:25 a.m. (Piispanen testified he was woken up when defendant Gulley called telling him that her godson was sick at 7:15 a.m., at the latest 7:25 a.m.), and told her Christopher was nonresponsive.  Fiore testified there was a medical possibility that prompt medical attention may have kept Christopher alive, even if given his significant head injury she could not say in what condition he would have lived. Instead of calling or directing defendant Christopher to call 911, defendant Gulley told him not to make such a call and defendants' subsequent actions (bringing Christopher to defendant Gulley's work, then to the VA hospital, then taking him back home) delayed calling medical help for almost an hour and a half. This evidence was sufficient to support a finding of implied malice in defendant Gulley's failure to act, which could have been a concurrent cause of Christopher's death. FN11 In a similar way, the juries could have believed defendant Gulley inflicted the fatal injury, but defendant Christopher's subsequent failure to get prompt medical attention amounted to implied malice and concurrent causation of Christopher's death.

FN11. The prosecutor argued defendant Gulley's instruction to defendant Christopher not to call 911 amounted to implied malice. Peculiarly, the prosecution seemed to later abandon this theory of murder when, in response to the defense argument that the delay did not cause Christopher's death, the prosecutor agreed and stated she was not alleging the delay caused his death, but that the delay showed defendant Gulley's consciousness of guilt.

Finally, we reject defendants' claim that the combination of the instructions permitted their juries to find them guilty of murder and assault causing the death of a child based only on finding defendants equally responsible for the criminal abuse of Christopher over the course of the nine-day period prior to his death.

In assessing whether the jury instructions given were erroneous, we "'"'"'must consider the instructions as a whole ... [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' [Citation.]"' [Citations.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1148- 1149, overruled on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) Here the juries were not only given the instructions on causation and concurrent causation, but given an instruction on the natural and probable consequences theory, which provided the juries with correct instruction on the permissible way the uncharged target crimes of child abuse and infliction of physical punishment could be used to find defendants guilty of murder and/or assault causing the death of a child. (CALCRIM No. 403.) Such instruction expressly told each jury that in order to find the defendant guilty of murder and/or assault causing the death of a child, it must be satisfied beyond a reasonable doubt (1) that the crime of child abuse or inflicting physical punishment was committed, (2) that defendant aided and abetted such crime, (3) that a coprincipal in such crime committed the crimes of murder and/or assault causing the death of a child, and (4) that the crime of murder and/or assault causing the death of a child was a natural and probable consequence of the commission of the crime of child abuse or inflicting physical punishment. The entire charge to the jury considered together, precluded the jury from finding the defendant guilty based on a natural and probable consequences theory without first finding the other defendant committed murder and/or assault causing the death of a child.

14

Moreover, there is no reasonable likelihood the jury misunderstood the causation instructions in the manner defendants suggest. (*People v. Cain* (1995) 10 Cal.4th 1, 36-37; *People v. Clair* (1992) 2 Cal.4th 629, 662-663.) The concurrent causation and causation instructions were directed to causation of Christopher's death, not his injuries. There was no dispute Christopher died from trauma to his head. His other injuries, the bruises and abrasions from the neck down, were not lifethreatening. Such injuries, while likely to have been the result of child abuse or infliction of physical punishment, did not cause Christopher's death. Given such circumstances, the jury was unlikely to apply defendants' proposed strained interpretation of the instructions when there were factual scenarios to which the concurrent causation instruction logically could be applied.

The trial court did not err in giving CALJIC No. 3.41.

To the extent that Gulley raises issues of the proper application of State law, they are beyond the purview of this Court in a federal habeas proceeding.  It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law.[21]  A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."[22]  This principle applied to federal habeas review of state convictions long before AEDPA.[23]  A federal court errs if it interprets a state legal doctrine in a manner that directly conflicts with the state supreme court's interpretation of the law.[24]  It does

---

[21] *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (it is presumed that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002); *see also Engle v. Isaac*, 456 U.S. 107, 119 (1982) (challenging the correctness of the application of state law does not allege a deprivation of federal rights sufficient for habeas relief); *Bell v. Cone,* 543 U.S. 447, 455 (2005) (a federal court may not lightly presume that a state court failed to apply its own law).

[22] *Bradshaw v. Richey,* 546 U.S. 74, 76, (2005); *see West v. AT&T,* 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").

[23] *See Mullaney v. Wilbur,* 421 U.S. 684, 691 (1975) ("state courts are the ultimate expositors of state law").

[24] *See Bradshaw*, 546 U.S. at 76–78 ("Because the Sixth Circuit disregarded the Ohio Supreme Court's authoritative interpretation of Ohio law, its ruling on sufficiency of the evidence was erroneous.").

not matter that the state supreme court's statement of the law was dictum if it is perfectly clear and unambiguous.[25]

A determination of state law by a state intermediate appellate court is also binding in a federal habeas action.[26]  This is especially true where the highest court in the state has denied review of the lower court's decision.[27]

A petitioner may not transform a state-law issue into a federal one by simply asserting a violation of due process.[28]  Nor may a federal court issue a habeas writ based upon a perceived error of state law, unless the error is sufficiently egregious to amount to a denial of due process under the Fourteenth Amendment.[29]  "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension."[30] Gulley's claim to this Court constitutes a state-law claim, i.e., that the California courts erroneously applied state law regarding California form jury instructions to the facts of her case. Accordingly, because the California Court of Appeal held that her claim was without merit, and she has failed to show, or even allege, an error of constitutional magnitude, her claim is beyond the purview of this Court.

Even if this Court were to reach the merits of Gulley's claim, she would still not prevail. A challenged instruction violates the federal constitution only if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of

---

[25] *Id.* at 76.

[26] *See Hicks v. Feiock,* 485 U.S. 624, 629-30 & n.3 (1988) (noting state appellate court's determination of state law is binding and must be given deference).

[27] *Id.*; *see also West,* 311 U.S. at 237 ("This is the more so where, as in this case, the highest court has refused to review the lower court's decision rendered in one phase of the very litigation which is now prosecuted by the same parties before the federal court.").

[28] *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996).

[29] *See Pulley v. Harris*, 465 U.S. 37, 41 (1984) (dictum).

[30] *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (internal citation omitted); *see Wainwright v. Goode*, 464 U.S. 78, 86 (1983) (per curiam).

constitutionally relevant evidence."[31]  The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment.[32]  This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions.[33]

It is well established that not only must the challenged instruction be erroneous but it must violate some constitutional right and may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.[34]  This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn.[35]  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation."[36]  In this case, however, Gulley does not challenge the substance of CALJIC 3.41, merely the fact that it was erroneously given.[37]

Under California law, an instruction on concurrent causation is required in a murder prosecution, if there is evidence that the conduct of two of more persons may have contributed

---

[31] *Boyde v. California,* 494 U.S. 370, 380 (1990).

[32] *Francis v. Franklin*, 471 U.S. 307, 309 (1985).

[33] *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh,* 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *Francis v. Franklin*, 471 U.S. at 324 n. 9 (1985).

[34] *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).

[35] *Id*. at 72-73.

[36] *Id*.

[37]  This Court notes that because neither the Ninth Circuit or the Supreme Court has directly ruled on the constitutionality of CALJIC 3.41, Gulley would not be able to cite to any "clearly established federal law" in support of such a proposition.

concurrently to a death.[38]  The prosecution submitted evidence that Gulley admitted to violently

shaking the victim and pushing him against the wall, causing him to hit his head.  The jury also

heard evidence that Defendant Christopher subsequently threw the victim against the wall.  The

combination of this evidence supports the prosecution's theory that the victim's head injury

could have been the result of multiple acts, which constituted a single, abusive "event," and that

he was fatally injured by the acts of both defendants.[39]  Thus, under California law, there was

sufficient testimony to warrant the concurrent causation instruction.  Accordingly, Gulley has

failed to show an error of state law, let alone an error which implicates her constitutional rights.

Finally, this Court notes that the trial court also instructed the jury that certain

instructions may not apply depending on their findings of fact about the case.  Thus, had the jury

determined that Gulley's abuse of the victim had not been a substantial factor in his death, or that

the damage caused by her abuse was not operative at the time of death, it could have disregarded

CALJIC 3.41.  Thus, Gulley has failed to show that the reading of CALJIC 3.41 so infected her

trial that she was deprived of the fair trial guaranteed by the Fourteenth Amendment.[40]  Gulley's

first claim is without merit.

<u>Ineffective Assistance of Counsel</u>

In her second ground, Gulley claims that her trial counsel was deficient because he failed

to "object to sentencing errors," failed to "put on witnesses" and failed to "put on a defense."[41]

---

[38]  *See* CALJIC No 3.41 use note (CALJIC 3.41 should be given where evidence places in issue two or more proximate causes of the result of the crime);  *People v. Caldwell*, 681 P.2d 274 (Cal. 1984).

[39]  Gulley appears to argue that CALJIC 3.41 was not proper because the prosecution submitted no evidence that Gulley and Defendant Christopher abused the victim at the same time.  However, the testimony did support the conclusion that each defendant's abusive conduct was a substantial factor which contributed to the victim's death, and that both substantial factors were operative at the moment of death.

[40]  *Francis*, 471 U.S. at 309.

[41]  As Respondent notes, in one portion of her petition, Gulley states a third ground of ineffective assistance as "failure to present witnesses." However, in her discussion of the claims,

Respondent asserts this claim is unexhausted.  This Court may not consider claims that have not been fairly presented to the state courts.[42]  Exhaustion of state remedies requires the petitioner to fairly present federal claims to the state courts in order to give the state the opportunity to pass upon and correct alleged violations of its prisoners' federal rights.[43]  In this case, Gulley did not raise her claim of ineffective assistance of counsel on direct appeal, nor did she raise it in a petition for habeas corpus in the state courts.  Thus, because the California courts did not have an opportunity to rule on the merits of this matter, Gulley's second claim is unexhausted.  However, this Court notes that it may deny a habeas claim on the merits the failure to exhaust notwithstanding,[44] when it is clear that the petition does not raise a colorable federal claim.[45]  Because Gulley has failed to raise a cognizable federal claim, this Court will dispose of it on its merits.

Under *Strickland v. Washington*, to demonstrate ineffective assistance of counsel, Petitioner must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.[46]  A deficient performance is one in which counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment.[47]  Gulley must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability

---

she combines this ground with the general "failure to present a defense claim."  This Court will address them in this manner.

[42] 28 U.S.C. § 2254(b)(1); *see Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing cases).

[43] *Duncan v. Henry,* 513 U.S. 364, 365 (1995).

[44] 28 U.S.C. § 2254(b)(2).

[45] *Cassett v. Stewart,* 406 F.3d 614, 624 (9th Cir.2005).

[46] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[47] *Id*.

that, but for counsel's ineffectiveness, the result would have been different.[48]  An analysis that

focuses "solely on mere outcome determination, without attention to whether the result of the

proceeding was fundamentally unfair or unreliable, is defective."[49]

*Strickland* and its progeny do not mandate that this Court act as a "Monday morning

quarterback" in reviewing tactical decisions.[50]  Indeed, the Supreme Court admonished in

*Strickland*:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too
> tempting for a defendant to second-guess counsel's assistance after conviction or
> adverse sentence, and it is all too easy for a court, examining counsel's defense
> after it has proved unsuccessful, to conclude that a particular act or omission of
> counsel was unreasonable.  A fair assessment of attorney performance requires
> that every effort be made to eliminate the distorting effects of hindsight, to
> reconstruct the circumstances of counsel's challenged conduct, and to evaluate
> the conduct from counsel's perspective at the time.  Because of the difficulties
> inherent in making the evaluation, a court must indulge a strong presumption that
> counsel's conduct falls within the wide range of reasonable professional
> assistance; that is, the defendant must overcome the presumption that, under the
> circumstances, the challenged action might be considered sound trial strategy.
> There are countless ways to provide effective assistance in any given case.  Even
> the best criminal defense attorneys would not defend a particular client in the
> same way.[51]

### Failure to Object to Sentencing Errors

Gulley claims her counsel was ineffective for failing to object to a sentencing error.

Specifically, Gulley claims that the court gave her no credit for the 828 days she had spent in

custody throughout the proceedings.  However, as Gulley notes, the California Court of Appeal

---

[48] *Hill v. Lockhart,* 474 U.S. 52, 57 (1985).

[49] *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *see Strickland*, 466 U.S. at 687; *see also Kimmel v. Morrison*, 477 U.S. 365, 374 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect"); *United States v. Cronic*, 466 U.S. 648, 258 (1984) ("the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.").

[50] *See Harris v. Reed*, 894 F.2d 871, 877 (7th Cir. 1990).

[51] 466 U.S. at 689 (internal citations and quotation marks omitted).

corrected this mistake.  Thus, Gulley is unable to show that her counsel's failure to object to the court's sentence affected her in any way.  Because Gulley has failed to show prejudice she is not entitled to relief.[52]

Counsel Failed to Put on a Defense

Gulley next claims that her counsel failed to call any witnesses or put on a defense. Gulley first asserts that her attorney should have called her mother, father and best friend as character witnesses.  However, Gulley fails to demonstrate that these individuals were willing and able to testify or to what they would have testified.  She does not consider or address the fact that reasonable counsel may not want to put the issue of her character into play.  Specifically, the prosecution presented evidence that Gulley had lied during the police interview and that she and Defendant Christopher had abused the victim before.[53]  Had Gulley's mother, father or best friend offered positive character testimony of Gulley, they could have been impeached with this evidence, along with their bias.  Certainly, a reasonable attorney would want to minimize the jury's consideration of such evidence.  Furthermore, Gulley fails to demonstrate how positive character evidence would have overcome her own admissions to police officers and the corroborating physical evidence that she had violently abused the victim shortly before his death. Because Gulley has failed to show either a deficient performance or prejudice, her claim is without merit.[54]

---

[52] *Strickland*, 466 U.S. at 687.

[53] There was testimony that the victim had bruising on the front of his chest, a bruise below his knee, areas of injury to his left forearm, an area of healing injury to his wrist, a healing abrasion on his right upper thigh, an injury to his upper cheek right below the left eye, older burn scars on his lower leg, and bruises on his right thigh, right hip, over his right buttocks, on his right shin, on his back and on the front and back of his right upper arm.  Certainly, some of these injuries could have been inflicted by someone else, but a reasonable jury could infer that the fresh wounds had occurred within in the nine days preceding the victim's death, while he was staying with the defendants.

[54] *Strickland*, 466 U.S. at 687.

Next, Gulley makes the conclusory allegation that her counsel should have ordered a psychological exam for her, so that the administering psychologist could be called to testify "as to what type of person [Gulley] was."  Gulley concludes that without this evidence, the jury was left to speculate that Gulley was an abusive "monster."  Gulley does not claim that she informed her attorney of any desire or need to be evaluated.[55]  Nor does she say what exactly a psychological exam would have revealed.  As a threshold matter, it is entirely uncertain whether the trial judge would have permitted such evidence.[56]  Presumably, Gulley hopes that a psychologist would have found that she was incapable of committing the abusive acts on the victim.  However, Gulley's presumption that a psychologist would have reached a positive assessment of Gulley's personality is purely speculative.  Even if such evidence were admissible, Gulley fails to demonstrate how a psychological exam, regardless of the assessment, would have overcome her own admissions to police officers and the corroborating physical evidence that she had violently abused the victim shortly before his death.  Because Gulley has failed to show either a deficient performance or prejudice, her claim is without merit.[57]

Finally, Gulley claims that her attorney should have done more to impeach the testimony of the victim's brother Deon (DJ).  She first claims that counsel should have called a witness to impeach DJ, who Gulley claims had a motive to lie because he had engaged in conduct that caused injury to the victim.  As with her previous claims, this allegation is conclusory and speculative.  Gulley does not allege that DJ had a propensity for lying, nor does she identify any

---

[55]  Gulley does not allege that she was mentally incompetent at the time of the alleged act or during her trial, only that the evaluation would have served as some form of character-evidence.

[56]  There is recent authority for the admission of opinion evidence to prove character as circumstantial evidence of conduct.  *People v. Jones*, P.2d 38 (Cal. 1954) (error to exclude expert psychiatric opinion that the defendant was not a sexual psychopath and, hence, unlikely to have violated Penal Code Section 288).  However, opinion evidence generally has been held inadmissible. *See People v. Spigno*, 319 P.2d 458 (Cal. 1957) (ruling to exclude opinion evidence full discussion of the Jones case).

[57]  *Strickland*, 466 U.S. at 687.

individuals who were ready, willing, and able to testify concerning DJ's character for truthfulness.  Gulley also overlooks the fact that Defendant Christopher's nephew, Jeffrey, did contradict DJ's testimony, but that even with this contradiction, the jury presumably found DJ credible.[58]  Finally, Gulley fails to show how this testimony would rebut Coulter's testimony that neither the fight DJ had with the victim, nor any similar interactions, caused the victim's injuries.  Because Gulley has failed to show either a deficient performance or prejudice, her claim is without merit.[59]

<u>CONCLUSION AND ORDER</u>

Gulley is not entitled to relief under any ground raised in the Petition.  Accordingly,

**IT IS HEREBY ORDERED THAT** the Petition Under 28 U.S.C. § 2241 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.[60]

The Clerk of the Court is to enter judgment accordingly.

Dated: January 19, 2011

    /s/ James K. Singleton, Jr.    
**JAMES K. SINGLETON, JR.**
United States District Judge

---

[58]  The prosecution elicited testimony from Jeffery which would have allowed the jury to infer Jeffery had been coached to fabricate his testimony.

[59]  *Strickland*, 466 U.S. at 687.

[60]  *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.